**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ JAN 2 1 2004 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

                     :

BEN GERSTEN (00-A-0546),         :

                     :

           Petitioner,    :

                     :

     – against –          :

                     :

DANIEL SENKOWSKI, Superintendent of  :
Clinton Correctional Facility,     :

                     :

          Respondent.    :

                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM,
JUDGMENT & ORDER
02-CV-3973 (JBW)
03-MISC-0066 (JBW)

APPEARANCES:

For Petitioner:

        Laurie S. Hershey, Esq.
        222 Park Ave.
        Manhasset, NY 11030
        By: Kevin J. Keating, Esq.
           Georgia J. Hinde, Esq.

For Respondent:

        Denis Dillon
        District Attorney, Nassau County
        262 Old Country Rd.
        Mineola, NY 11501
        By: Karen Wigle Weiss, Esq.
           Assistant District Attorney, of Counsel

JACK B. WEINSTEIN, Senior District Judge:

## Table of Contents

I. Introduction ............................................................................................................. 3

II. Facts and Procedural History .................................................................................. 4

    A. Pretrial Proceedings ........................................................................................... 4

    B. Trial ................................................................................................................... 5

        1. The People's Case ........................................................................................ 5

            a. The Daughter ......................................................................................... 5

            b. The Wife ................................................................................................ 7

            c. The Child Psychologist ......................................................................... 7

            d. The Examining Physician ....................................................................... 8

            e. The Boyfriend ........................................................................................ 8

        2. The Defense ................................................................................................. 8

    C. State Direct Appeals ........................................................................................... 9

    D. State Collateral Attacks ...................................................................................... 9

    E. Current Federal Habeas Proceedings ................................................................ 10

        1. The Petition .............................................................................................. 10

        2. The Hearing .............................................................................................. 12

            a. The Examining Physician ..................................................................... 12

            b. Trial Counsel ........................................................................................ 13

III. Law ..................................................................................................................... 14

    A. AEDPA ............................................................................................................ 14

    B. Exhaustion ....................................................................................................... 16

    C. Procedural Bar .................................................................................................. 16

    D. Ineffective Assistance of Counsel ..................................................................... 18

        1. In General ................................................................................................. 18

        2. Failure to Consult with or Call an Expert Witness in Cases Involving Child

            Sexual Abuse ............................................................................................ 21

    E. Errors of State Law ........................................................................................... 23

        1. In General ................................................................................................. 23

        2. Admission of Uncharged Crimes Testimony ............................................. 23

    F. Harmless Error .................................................................................................. 24

IV. Analysis of Claims ............................................................................................... 25

    A. Ineffective Assistance of Counsel ..................................................................... 25

        1. Failure to Consult with or Call Expert Witnesses ..................................... 25

            a. Medical ................................................................................................ 25

            b. Psychological ........................................................................................ 29

        2. Failure to Request a *Frye* Hearing ......................................................... 30

        3. Failure to Object to Uncharged Crimes Evidence .................................... 30

        4. Remaining Claims ..................................................................................... 31

    B. Admission of Uncharged Crimes Testimony ..................................................... 31

    C. Other Claims

V. Conclusion ........................................................................................................... 32

## I. Introduction

Sexual abuse of a daughter by her father is a heinous crime. Here the trial record graphically details almost-nightly rapes and sodomizing of a young girl in her family home by her parent over many years. Such an accusation requires a skilled defense. *See Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003); *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001); *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) (importance of effective representation for defendants in child sexual abuse prosecutions). Since such cases frequently hinge on the credibility of the child, the Court of Appeals for the Second Circuit has declared that "defense counsel is obliged, wherever possible, to elucidate any inconsistencies in the complainant's testimony, protect the defendant's credibility, and attack vigorously the reliability of any physical evidence of sexual contact between the defendant and the complainant." *Eze*, 321 F.3d at 112.

Whether these standards were met in this case presents a troubling question. For the reasons stated below, it is answered in the negative. The state trial and appellate record and a hearing in this court support the conclusion that trial counsel failed his client.

Petitioner, a law school graduate who passed the New York Bar examination but apparently never practiced as an attorney, was charged with the sodomy and sexual abuse of his daughter. A bench trial, insisted upon by petitioner in opposition to his attorney's advice, resulted in conviction on all charges and a lengthy prison term.

Trial counsel failed to consult with or call an expert medical witness regarding the physical indicia of sexual abuse. Had he done so he would have been in a position to rebut critical aspects of the testimony of the People's medical expert at trial, significantly calling into question whether the physical examination of the daughter revealed penetrative trauma to her

3

vagina and anus. In light of the daughter's allegations of continuing rape and sodomy over a period of years, the absence of physical indicia of such abuse would necessarily have been troubling to a trier of fact. Counsel's unexplained and unreasonable failure to present this and other potentially exculpatory evidence significantly undermines confidence in the outcome of the trial.

## II. Facts and Procedural History

Petitioner was charged with six counts of sodomy in the first degree, two counts of sexual abuse in the first degree, and one count of endangering the welfare of a child. The acts charged occurred during the period from March 1995 to December 1998 when the daughter was between ten and thirteen years old. He was convicted on all nine counts. The trial court imposed a sentence of consecutive indeterminate terms of imprisonment of twelve and one-half to twenty-five years on the first three counts of sodomy in the first degree, concurrent indeterminate terms of imprisonment of twelve and one-half to twenty-five years on the remaining three counts of sodomy in the first degree, concurrent determinate terms of incarceration of seven years on each sexual abuse conviction, and a concurrent sentence of one year imprisonment for endangering the welfare of a child. He was designated a sex offender pursuant to the Sex Offender Registration Act. *See* N.Y. Correction L., art. 6-C. The lengthy imprisonment (under probable high risk of physical harm if other prisoners become aware of his crime) and the lifetime legal and social stigmas constitute a heavy punishment.

## A. Pretrial Proceedings

Prior to the commencement of trial, a *Ventimiglia* hearing was held. *See People v. Ventimiglia*, 420 N.E.2d 59 (N.Y. 1981) (providing for a hearing in which the court assesses the

4

probative force and prejudicial effect of any uncharged crimes sought to be introduced at trial).

The prosecution sought to introduce, as part of the People's direct case, evidence that petitioner

(1) began sexually abusing his daughter when she was five years old – years before the charged

crimes occurred – and that the abuse escalated to petitioner forcing her to perform oral sex on

him when she was seven years old; and (2) forced his daughter to have vaginal intercourse with

him twice during November 1998, when she was thirteen years old, at his mother's apartment.

These crimes were not charged in the indictment.

The prosecution argued that this evidence was relevant in establishing the forcible

compulsion element of sodomy in the first degree and in showing a pattern or course of conduct

by petitioner. Defense counsel opposed the prosecutor's application and argued for preclusion of

all evidence of uncharged crimes.

The court ruled that the prosecution could introduce as part of the People's direct case,

but solely for the purpose of permitting the court to fully understand the victim's testimony,

evidence that petitioner began sexually abusing his daughter when she was five. The court also

permitted the prosecution to introduce evidence that petitioner forced his daughter to have

vaginal intercourse with him on two occasions in November 1998. It stated that it would

consider these acts only as they pertained to the daughter's state of mind, to the medical evidence

presented, and to the timing of the daughter's disclosure of the abuse.

B. Trial

    1. The People's Case

        a. The Daughter

At trial, petitioner's daughter gave detailed testimony of her father's sexual abuse. She

testified that, beginning when she was five years old, her father began entering her bedroom at night and touching her on her chest and between her legs. When she was seven years old, he began inserting his penis into her mouth and having anal intercourse with her. He also placed his mouth on her vagina. The sexual abuse continued almost every night despite her continued pleas to stop. Even after her parents separated and petitioner moved out of the family home, he continued to abuse his daughter during her overnight visits. On two occasions when the daughter was visiting her father at his mother's apartment, he forced her to have vaginal intercourse with him. She said that her father threatened to kill her if she told anyone about the abuse.

She went on to testify that between March 15 and March 30, 1995, petitioner entered her bedroom on a nightly basis and sexually abused her. On some nights, he inserted his penis into her mouth and ejaculated. On other nights, he inserted his penis into her anus. Several times he placed his mouth on her vagina. On December 13, 1998, he rubbed her vagina and grabbed her hand, pushing it down the front of his pants.

Despite these events, the child testified that she loved the "good daddy" who took her places and spent time with her, but feared the "bad daddy" who abused and threatened her. She never complained to her therapists, her boyfriend or her mother during the years leading up to the prosecution. At the sentencing, she asked that the maximum sentence be imposed.

Before the alleged sexual attacks, the daughter had been diagnosed as having Attention Deficit Disorder. She was placed on a high dose of Ritalin and later was given Lithium and Prozac. Nevertheless, her grades were apparently in the range of B to A+ throughout her years at school except for a year or so prior to trial. No behavioral problems suggested sexual abuse. Throughout the cross-examination, the daughter remained unshaken and cogent, suggesting a

6

highly intelligent and articulate youngster.

### b. The Wife

Elaine Gersten, petitioner's former wife and the mother of the victim, testified that her daughter always did very well in school, but she was very fearful about going to bed at night, experienced nightmares, and often pleaded with her mother not to leave her. As a result of her problems, the daughter received therapy. Sometimes when bathing her daughter when she was a young child, Ms. Gersten noticed a redness about her vagina, but did not take steps to find out the cause. Despite the fact that the marital bedroom she shared with her husband adjoined that of their daughter, she testified she was never aware of the sexual abuse occurring next door in the daughter's bed.

Ms. Gersten further stated that her husband disappointed her because he seemed incapable of holding a job despite his law degree. She, by contrast, was a successful business woman often away from home. She described their divorce as relatively amicable with no issues concerning custody or visitation.

After the divorce, her daughter did not want to see her father and became increasingly angry and fearful of seeing him. When her daughter first told her of the sexual abuse in an emotional outburst one night, the matter was immediately reported to the authorities. The prosecution proceeded apace.

### c. The Child Psychologist

Dr. Donald J. Lewittes, a clinical psychologist specializing in child and adolescent trauma including child sexual abuse, testified about Child Sexual Abuse Accomodation Syndrome. He explained that the syndrome covers different stages or processes generally experienced by

7

children who are sexually abused and, in particular, by children sexually abused by family members. Although every child is unique and will have idiosyncratic reactions to intra-familial sexual abuse, five elements make up the syndrome: secrecy, helplessness, disclosure, entrapment and accomodation, and emotions experienced as a result of trauma. He also testified that when a child reaches adolescence and becomes more aware of his or her sexuality disclosure of incidents of sexual abuse are triggered. He opined that school performance is not determinative of whether a child has been sexually abused.

### d. The Examining Physician

Dr. Bella Silecchia, director of pediatric services and the Suspected Child Abuse and Neglect Evaluation Program at the Nassau County Medical Center, testified about the results of her physical examination of petitioner's daughter. She explained the process whereby the genital area was magnified and photographed using a device known as a colposcope and detailed what she observed during the examination and later on the colposcopic slides. The doctor opined that the daughter had suffered penetrating trauma to her hymen and tearing of the anus. Although she did not offer an opinion as to the cause of the trauma, she stated that it was not caused by masturbation.

### e. The Boyfriend

The daughter's former boyfriend testified that during their relationship, he and the daughter occasionally engaged in "mutual masturbation." They never engaged in oral sex or vaginal or anal intercourse, and he never inserted anything into her vagina or anus.

### 2. The Defense

Petitioner did not testify at trial. He called no witnesses.

8

## C. State Direct Appeals

The Appellate Division modified the judgment by reducing the minimum term of incarceration on each count of first-degree sodomy to eight and one-third years. Otherwise, it affirmed. With regard to petitioner's contention of ineffective assistance of counsel, the court found, "under the totality of circumstances existing at the time of representation, the defendant received meaningful representation." *People v. Gersten*, 719 N.Y.S.2d 900 (N.Y. App. Div. 2001). Leave to appeal to the New York Court of Appeals was denied. *People v. Gersten*, 756 N.E.2d 87 (N.Y. 2001).

## D. State Collateral Attacks

While his direct state appeal was pending, petitioner filed a motion, pursuant to section 440.10 of the New York Criminal Procedure Law, to vacate the judgment of conviction on the ground that he was deprived of effective assistance of trial counsel. Specifically, petitioner alleged that his trial counsel conducted an inadequate pre-trial investigation, improperly failed to call expert witnesses to contradict the People's expert witnesses, improperly neglected to request a *Frye* hearing, inexcusably failed to show a motive for the daughter to lie about being sexually abused by petitioner, unadvisedly waived a jury trial, and failed to use a diary and information concerning the daughter's use of the Internet during cross-examination.

The trial court denied the motion, stating, "At trial defense counsel vigorously cross-examined the People's expert witnesses. Counsel neutralized the impact of Dr. Silccchia at trial." *See* Respondent's Exhibits, Vol. II, Exhibit 11, at 3. With respect to the claim that trial counsel should have called an expert witness, the court noted that, even without consulting a medical expert, defense counsel was able "to put forth his theory of the case by getting the

9

Doctor to admit that what she observed about the victim could have come from non-sexual abuse related activity." *Id.* It found that defense counsel made decisions and conducted the trial in accordance with a clear trial strategy which was that there were non-sexual abuse explanations for what happened to the victim and that she was lying about the sexual abuse. This trial strategy, the court concluded, did not require defense counsel to consult with or call expert witnesses. *Id.* at 3-4. The court also applied this same analysis to Dr. Lewittes' testimony. *Id.* at 3-4.

With respect to the claim that trial counsel was ineffective for failing to request a *Frye* hearing, the court noted that counsel would not have been entitled to such a hearing because the subject of Dr. Lewittes's testimony, Child Sexual Abuse Accomodation Syndrome, was a recognized diagnosis in New York. *See id.* at 4.

The court found the remainder of the complaints against trial counsel to be frivolous. *Id.* Leave to appeal from the denial of the motion to vacate the judgment was denied. *See* Respondent's Exhibits, Vol. II, Exhibit 15.

E. Current Federal Habeas Proceedings

1. The Petition

Petitioner alleges that he was deprived of his constitutional right to effective assistance of counsel because of his trial attorney's failure to obtain critical medical discovery materials or have another expert examine the materials or testify on his behalf. He attaches two expert affidavits in support of his motion. Both affidavits were also included in petitioner's state 440.10 motion to vacate the judgment of conviction.

The first is from Jocelyn Brown, doctor of pediatric medicine and director of the Child

Advocacy Center of Columbia Presbyterian Hospital. Dr. Brown finds fault with a number of the findings made by the People's medical expert at trial. Based on her own examination of the medical evidence, she is unable to conclude that any of it is suggestive of penetrating trauma to the daughter's vagina or anus. *See* Petitioner's Br., Exhibit A, ¶¶ 12-19.

The second is from John C. Yuille, Ph.D., a forensic psychologist and recognized expert in the field of child sexual abuse. Dr. Yuille states that Child Sexual Abuse Accomodation Syndrome is no longer accepted in the child sexual abuse research community. He also concludes that the testimony of the People's expert at trial that the onset of adolescence can trigger a child to disclose incidents of sexual abuse is a theory which has no scientific validity. *See* Petitioner's Br., Exhibit B, ¶¶ 7, 9.

Petitioner cites a variety of other errors in support of his ineffective assistance of counsel claim including: (1) counsel's failure to call an expert witness to rebut Dr. Lewittes' testimony; (2) counsel's failure to request a *Frye* hearing with respect to Dr. Lewittes; (3) counsel's failure to challenge the People's use of uncharged crimes evidence on the ground that the probative value of the evidence was outweighed by the resulting prejudice; (4) counsel's failure to seek inspection of the grand jury minutes; (5) counsel's attempt to consolidate the charges with then-pending charges in New York county; (6) counsel's failure to introduce a floor plan of the house or to call a fact witness to testify that the daughter's bedroom was very close to her parents' bedroom and thus it was unlikely her mother would never have heard any of the incidents of sexual abuse; and (7) counsel's inappropriate statements at the sentencing phase.

The second claim is that petitioner was deprived of due process of law by the trial court's evidentiary ruling admitting uncharged crimes evidence which consisted of other instances of

11

sexual abuse and rape committed by petitioner against his daughter.

All of the asserted claims have been exhausted. The petition is timely.

2. The Hearing

A full evidentiary hearing was held in this court in January 2004.

a. The Examining Physician

Dr. Silecchia, recognized by this court as an expert in the field of child sexual abuse, confirmed that she reviewed her testimony at petitioner's trial and found it to be accurate. Transcript of January 12, 2004, at 34, 36-37, *Gersten v. Senkowski*, 02-CV-3973 (E.D.N.Y. 2004). She noted that the colposcopic slides taken during her physical examination of the daughter failed to capture everything that she observed. She pointed out that the colposcope is often difficult to focus so doctors supplement the photographs by describing their observations during an examination. *Id.* at 37-38.

On cross-examination, it became apparent that the terminology and findings used by Dr. Silecchia in the medical report and during her trial testimony differ somewhat from those recommended by the American Professional Society on the Abuse of Children (APSAC) in its guidelines on findings of clinical significance in the medical evaluation of children alleging sexual abuse. For instance, although APSAC has discouraged the use of the term "neovascularization of the posterior fourchette," Dr. Silecchia testified that she would not "abandon the term" because she found it to be "descriptive." *Id.* at 53. Furthermore, she stated that she disagrees with APSAC's opinion that clefts on the hymen in the eleven o'clock position are non-specific to child abuse, instead opining that such a finding "depends on the type of hymen." *Id.* at 56. With regard to her observations based on the anal examination of the

12

daughter, she admitted it is "possible" that, as APSAC states, such findings are of unknown significance in evaluating sexual abuse. *Id.* at 57-58.

### b. Trial Counsel

Petitioner was represented by Dennis Lemke on the Nassau County sodomy charges which are the subject of this habeas petition as well as on then-pending rape charges in New York County. Mr. Lemke testified that it was his belief that the daughter would not be available to testify at the trial because she had been institutionalized for attempting suicide, or that, if she did appear in court, petitioner's control over his daughter was such that she would refuse to testify against him. *Id.* at 79, 81. Based on that belief and in an attempt to "fast-track the case," Mr. Lemke asked to consolidate the Manhattan rape allegations with the sodomy charges in Nassau County – apparently a legally impermissible request. *Id.* at 78-81. He did not, however, investigate prior to trial whether the daughter actually was in an institution.

Mr. Lemke testified that, in preparation for trial, he obtained the daughter's medical records. He briefly consulted with a friend from law school, a former registered nurse with no special knowledge in the area of child sexual abuse, but he did not discuss with her in detail the medical terminology used in the records or its significance. *See id.* at 73, 90-93. He did not consult with a medical expert in the field of child sexual abuse. He could not recall whether he had examined colposcopic slides or photographs of the daughter's physical examination, but he admitted that, even if he had, it would not have been before the start of the trial. *Id.* at 86-88.

He reasoned that it was not necessary to investigate the medical evidence in further detail because the defense's strategy was that the medical evidence was consistent with the daughter's relationship with her boyfriend. He did not investigate anything not directly relevant to that line

13

of defense. *See id.* at 73-74, 87, 90-95.

Mr. Lemke further stated that he read some reports on Child Sexual Abuse Accomodation
Syndrome in preparation for trial. He was unfamiliar, however, with the writings of the author of
that theory or his subsequent retreat from the belief that it constitutes a syndrome. *Id.* at 96-97.

At the sentencing, he did not object to the prison term imposed by the court. He "was
quite embarrassed" to discover later that the sentence was impermissibly long. *Id.* at 85.

### III. Law

#### A. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal
court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on
the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a
decision that was contrary to, or involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a
decision that was based on an unreasonable determination of the facts in light of the evidence
presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a
federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quoting *Aycox v. Lytle*,
196 F.3d 1174, 1178 (10th Cir. 1999)). Under the "contrary to" clause, "a federal habeas court
may grant the writ if the state court arrives at a conclusion opposite to that reached by [the
Supreme Court] on a question of law or if the state court decides a case differently than [that]
Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362,
412–13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the

14

"unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002); *see also Yung v. Walker*, No. 01-2299, 2002 U.S. App. LEXIS 28137 (2d Cir. Aug. 1, 2003) (amended opinion) (district court's habeas decision that relied on precedent from the court of appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Torres v. Berbary*, No. 02-2463, 2003 U.S. App. LEXIS 16167, at *25 (2d Cir. Aug. 7, 2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

15

B. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy*, 455 U.S. 509, 522 (1989). "This exhaustion requirement is . . . grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).

Pursuant to AEDPA, a district court may now, in its discretion, deny on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane*, No. 98 CIV. 1604, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y. 2000) (state's failure to raise exhaustion requirement does not waive the issue).

C. Procedural Bar

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

16

alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. In determining whether a procedural bar is sufficient to preclude habeas review, a federal court must consider as "guideposts" the following:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee v. Kemna*, 534 U.S. 362 (2002)). State procedural rules are insufficient to bar federal review of a claim if the rules are not strictly or regularly followed, *see Barr v. City of Columbia*, 378 U.S. 146, 149 (1964), are novel and unforeseeable, *see NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 457 (1958), allow noncomplicance, *see Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 233–34 (1969), or impose undue burdens on the assertion of federal rights, *see Douglas v. Alabama*, 380 U.S. 415, 422–23 (1965). *See generally* Kermit Roosevelt III, *Light from Dead Stars: The Procedural Adequate and Independent State Ground Reconsidered*, 103 Colum. L. Rev. 1888 (2003) (addressing origins of the doctrine).

If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision) (emphasis in original).

17

When a state court says that a claim is "not preserved for appellate review" and then rules

"in any event" on the merits, such a claim is not preserved. *See Glenn v. Bartlett*, 98 F.3d 721,

724–25 (2d Cir. 1996). When a state court "uses language such as 'the defendant's remaining

contentions are either unpreserved for appellate review or without merit,' the validity of the

claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.*, 235 F.3d

804, 810 (2d Cir. 2000). Where "a state court's ruling does not make clear whether a claim was

rejected for procedural or substantive reasons and where the record does not otherwise preclude

the possibility that the claim was denied on procedural grounds, AEDPA deference is not given,

because we cannot say that the state court's decision was on the merits." *Su v. Filion*, No. 02-

2683, 2003 U.S. App. LEXIS 13949 at *15 n.3 (2d Cir. July 11, 2003) (citing *Miranda v.

Bennett*, 322 F.3d 171, 178 (2d Cir. 2003)). This congeries of holdings leaves it an open

question whether there are "situations in which, because of uncertainty as to what the state courts

have held, no procedural bar exists and yet no AEDPA deference is required." *Id.*

### D. Ineffective Assistance of Counsel

#### 1. In General

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall

enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

This is "the right to *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771

n.14 (1970) (emphasis added). The Supreme Court has explained that in giving meaning to this

requirement courts must be guided by its purpose—"to ensure a fair trial"—and that therefore the

"benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

undermined the proper functioning of the adversarial process that the trial cannot be relied on as

18

having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. *See also Wiggins v. Smith*, 123 S.Ct. 2527, 2535, 2542 (2003); *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The performance and prejudice prongs of *Strickland* may be addressed in any order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001). The court must also keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Purdy v. Zeldes*, No. 02-7468, 2003 U.S. App. LEXIS 2053, at *18 (2d Cir. Feb. 6, 2003) (quoting *Strickland*, 466 U.S. at 694). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003).

19

As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 123 S.Ct. at 2538. Where counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court will usually conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under *Strickland*'s prejudice prong. *See Pavel v. Hollins*, 261 F.3d 210, 223 (2d Cir. 2001) (counsel was ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation); *Lindstadt*, 239 F.3d at 201 (same). The Court of Appeals for the Second Circuit has recently gone so far as to imply that all of counsel's significant trial decisions must be justified by a sound strategy—a significant raising of the bar that would appear to require an unrealistic degree of perfection in counsel as well as the ability to justify largely intuitive decisions based on the arts of trial practice. *See Eze*, 321 F.3d at 136 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for . . . counsel's decisions").

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

20

Each factual claim made in support of an allegation of ineffective assistance of counsel must be fairly presented to a state court before a federal habeas court may rule upon it. *See Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991) (dismissing petition as unexhausted where petitioner's claim of ineffective assistance of counsel alleged more deficiencies before the habeas court than were presented to the state court, because "[t]he state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (quotation omitted)). Where an additional factual claim in support of the ineffective-assistance allegation merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it, dismissal is not required. *Caballero v. Keane*, 42 F.3d 738, 741 (2d Cir. 1994).

2. Failure to Consult with or Call an Expert Witness in Cases Involving Child Sexual Abuse

In three recent cases, the Court of Appeals for the Second Circuit has considered whether to grant habeas relief to New York state prisoners partly on the ground that their counsel was ineffective for failing to consult with medical experts familiar with issues concerning child sexual abuse. There is no *per se* rule that requires trial attorneys to seek out an expert. Nevertheless, in *Lindstadt v. Keane*, the court suggested that it is "'difficult to imagine a child abuse case . . . where the defense would not be aided by the assistance of an expert.'" 239 F.3d at 201 (quoting Beth A. Townsend, *Defending the "Indefensible": A Primer to Defending Allegations of Child Abuse*, 45 A.F. L. Rev. 261, 270 (1998)). In *Pavel v. Hollins* the court found that a criminal defendant had been prejudiced by counsel's failure to call a medical expert witness to testify—or at least to advise counsel—concerning indicia of physical abuse in a child

21

molestation case. 261 F.3d at 224–25. The *Pavel* court noted that there is "'little question that child sexual abuse cases often present a fertile, indeed, a necessary, area for expert assistance.'" *Id.* at 224 (quoting *United States v. Tornowski*, 29 M.J. 578, 580 (1989)). In *Eze v. Senkowski*, the court cited both *Lindstadt* and *Pavel* in support of its determination that counsel may have been ineffective for failing to consult with or call a medical expert in a sexual abuse trial. It pointed out:

> A lesson to be learned from *Lindstadt* and *Pavel* is that when a defendant is accused of sexually abusing a child and the evidence is such that the case will turn on accepting one party's word over the other's, the need for defense counsel to, at a minimum, consult with an expert to become educated about the "vagaries of abuse indicia" is critical. The importance of consultation and pre-trial investigation is heightened where, as here, the physical evidence is less than conclusive and open to interpretation.

321 F.3d at 128 (internal citations omitted); *see also Holsomback v. White*, 133 F.3d 1382, 1387 (11th Cir. 1998) (counsel ineffective for failing to call medical expert to testify about physical abuse in child sexual abuse case).

While it is normally essential that an expert be consulted concerning testimony of physical indicia of sexual abuse, courts are less clear as to whether expert assistance regarding psychological manifestations of abuse, often known as Child Sexual Abuse Accomodation Syndrome, is necessary. Testimony on Child Sexual Abuse Accomodation Syndrome is admissible in New York courts when it is relevant in a particular case. *See Eze*, 321 F.3d at 131 (citing *People v. Taylor*, 552 N.E.2d 131, 135 (1990); *Matter of Nicole V.*, 518 N.E.2d 914, 917 (1987)). The court in *Eze* has suggested that trial counsel has a "heightened responsibility to educate [him]self on the topic of child sexual abuse syndrome and, if necessary, consult an expert

22

in preparation for trial to ensure [the] client's interests were properly represented." 321 F.3d at

132. Although the court declined to find the failure to consult with or call a psychological expert

deficient in and of itself, it remained "troubled" by the failure and relied on this factor as one

among several errors, the cumulative weight of which rose to the level of constitutionally

deficient conduct. *See id.* at 132, 135-36.

E. Errors of State Law

1. In General

Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire*,

502 U.S. 62, 68 (1991). Nonetheless, the Due Process Clause requires that state courts

conducting criminal trials "proceed consistently with 'that fundamental fairness' which is

'essential to the very concept of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998)

(quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). Errors of state law that rise to the

level of a constitutional violation may be corrected by a habeas court, but even an error of

constitutional dimensions will merit habeas corpus relief only if it had a "'substantial and

injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S.

619, 623 (1993) (quotation omitted).

2. Admission of Uncharged Crimes Testimony

Although evidence of similar uncharged crimes has probative value, under New York law

it is generally excluded for policy reasons "because it may induce the jury to base a finding of

guilt on collateral matters or to convict a defendant because of his past." *People v. Alvino*, 519

N.E.2d 808, 812 (N.Y. 1987). Such evidence may be received, however, "if it helps to establish

some element of the crime under consideration or is relevant because of some recognized

23

exception to the general rule." *Id.* The evidence will be allowed so long as its probative value and the need for the evidence outweighs the potential for prejudice to the defendant. *People v. Cook*, 710 N.E.2d 654, 655 (N.Y. 1999); *see also United States v. Sappe*, 898 F.2d 878, 880 (2d Cir. 1990). Where the evidence is introduced in a bench trial and the trial court recognizes its limited probative force, the probability of prejudice is substantially reduced.

F. Harmless Error

In order to be entitled to habeas relief, a petitioner must ordinarily demonstrate that any constitutional error "had substantial and injurious effect or influence in determining the jury's verdict," and that the error resulted in "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quotation marks omitted).

When a claim was never adjudicated on the merits in the state courts and there is no ruling which commands AEDPA deference, it is unclear what the standard for review for harmlessness should be in a collateral attack when a federal court finds constitutional error. Should it proceed under the "beyond a reasonable doubt" standard of *Chapman v. California*, 386 U.S. 18 (1967) (conviction infected by constitutional error must be overturned unless "harmless beyond a reasonable doubt") or under the "substantial and injurious effect or influence" standard of *Brecht* (for cases on collateral review, an error is generally considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict")? The correct standard of review is an open question in this circuit. *See Cotto v. Herbert*, No. 01-2694, 2003 U.S. App. LEXIS 8326, at *92 (2d Cir. May 1, 2003). In any event, in deciding this case, the court would reach the same conclusion no matter which standard is applied.

## IV.  Analysis of Claims

### A.  Ineffective Assistance of Counsel

Trial counsel's performance was, in several respects, constitutionally deficient. It appears

that, based on counsel's belief that the daughter would be unavailable to testify at trial because

she had been institutionalized or would be unable to confront her father in open court, he did not

prepare an adequate defense. There was no valid basis for such a conclusion; in fact, the

daughter must have previously testified before the grand jury.

### 1.  Failure to Consult with or Call Expert Witnesses

#### a.  Medical

Although petitioner raises a number of errors in support of his ineffective assistance of

counsel claim, the most substantial error alleged is that trial counsel failed to conduct an

adequate pre-trial investigation into critical medical evidence. Prior to trial counsel never

obtained copies of the colposcopic slides made during the daughter's physical examination and

never arranged for their evaluation by an independent expert.

The examining physician, Dr. Bella Silecchia, testified at trial for the prosecution that the

results of her medical examination of the daughter were "highly suggestive" of penetrating

trauma to her vagina and anus. Tr. at 218. The doctor based her opinion on various technical

indicia, such as "thickened, fimbriated, redundant type of hymen" with "rolled edges"; "clefts"

and "notches" in hymenal tissue at positions corresponding to hours on a clock; "neo-

vascularization" of the "posterior fourchette"; healed anal fissures; and smoothing of the rectal

mucosa. Tr. at 211-17. This witness, who also testified before this court in the evidentiary

hearing, was impressive in her knowledge and bona fides. Trial counsel's cross-examination,

25

however, indicated little understanding of the medical fundamentals and how they might impact an expert's evaluation of the critical question in this case – had there been partial or complete penetrative trauma to the daughter's vagina or anus.

Despite the complicated medical issues, trial counsel failed to consult a medical expert or otherwise educate himself about the physical indicia of sexual abuse. His conversation with a registered nurse friend was a poor substitute for consultation with an expert in the field of child sexual abuse, especially since it did not involve a detailed explanation of the medical terminology or its significance to the case. Furthermore, there is nothing to suggest that trial counsel had previous significant experience litigating child sexual abuse cases. His lack of familiarity with the relevant medical terms and their significance limited his ability to effectively cross-examine Dr. Silecchia. Had counsel consulted a medical expert, it is likely he would have been able to present expert testimony, such as that of Dr. Jocelyn Brown, to largely rebut the conclusions of Dr. Silecchia. In any event, his cross-examination would certainly have been more telling.

In her affidavit submitted in support of petitioner's habeas petition, Dr. Brown finds fault with many of Dr. Silecchia's opinions. With respect to Dr. Silecchia's finding of neo-vascularization of the posterior fourchette, Dr. Brown notes that "such a finding is no longer considered of significance in the forensic community when evaluating children suspected of being sexually abused as the condition of 'neo-vascularization' can arise from enumerable factors unrelated to sexual abuse." Petitioner's Br., Exhibit A, ¶ 13. With respect to Dr. Silecchia's conclusion that the state of the daughter's hymen was indicative of a stretched or torn hymen, Dr. Brown concludes this finding is "erroneous" because the daughter had reached puberty at the

time of her examination and the same condition "is commonly found in post-pubertal children and is not indicative of penetrating trauma." *Id.* ¶ 14. As for the appearance of "notches" or clefts" on the hymen, Dr. Brown first notes that the two terms are not interchangeable as Dr. Silecchia suggested in her testimony. *Id.* ¶ 16. Upon examination of the colposcopic slides, Dr. Brown was only able to see a single notch in the four o'clock position, the presence of which "is not indicative of penetrating trauma" in an adolescent hymen. *Id.* ¶ 18. Finally, Dr. Brown disputes Dr. Silecchia's conclusions based upon the colposcopic slides of the anus. She notes that even if Dr. Silecchia's observations were accurate, "the association of these findings with sexual abuse remains uncertain as such findings are not currently recognized in the scientific community as dispositive of penetrating trauma to the anus." *Id.* ¶ 19.

In sum, Dr. Brown is unable to corroborate any of Dr. Silecchia's major findings and is unable to conclude that any of the medical evidence is suggestive of penetrating trauma to the daughter's vagina or anus. Had trial counsel presented her as an expert witness, he might have cast considerable doubt on Dr. Silecchia's testimony, adding weight to the defense's contention that no sexual abuse had occurred and further suggesting that no penetrating sexual activity whatsoever had taken place.

Trial counsel decided his theory of the case before conducting an adequate investigation into alternative, complementary defenses. There is no reasonable trial strategy which would have excluded the potentially exculpatory evidence offered by Dr. Brown. In neglecting to conduct an adequate pretrial investigation into the medical evidence or to make a reasonable decision that no investigation was necessary, trial counsel's performance fell below the objective standard of reasonableness required by *Strickland*.

27

Given the significance of such expert testimony, petitioner was prejudiced by his attorney's deficient performance. There is a reasonable probability that petitioner would not have been convicted had defense counsel conducted an adequate investigation into the medical evidence and called an expert to testify. This court makes no judgment as to whether Dr. Silecchia's or Dr. Brown's evaluations of the medical evidence are ultimately correct. It merely notes that the conclusions of these two doctors, both recognized as experts in the field of child sexual abuse, differ significantly. Such differences could invoke reasonable doubt in the mind of the factfinder.

Despite the fact that Dr. Brown's expert affidavit was offered in support of petitioner's section 440.10 motion, the state court refused the request for an evidentiary hearing and denied the motion. *See* Respondent's Exhibits, Vol. II, Exhibit 11. In rejecting petitioner's claim that trial counsel was ineffective for failing to consult with or call a medical expert, the trial judge found that defense counsel had vigorously cross-examined the People's expert, Dr. Silecchia, thus "neutralizing" the impact of her testimony at trial. He further noted that defense counsel was able "to put forth his theory of the case by getting the Doctor to admit that what she observed about the victim could have come from non-sexual abuse related activity." The trial judge concluded that, given the fact that Dr. Silecchia's testimony had been effectively "neutralized," defense counsel did not need to consult with or call expert witnesses to rebut her. *Id.* at 3-4.

Had trial counsel consulted with and called an expert witness such as Dr. Brown, he would have been able to present an additional defense – that no penetrating sexual activity had ever occurred. This theory would not have contradicted the defense's strategy of attributing the medical findings to the daughter's relationship with the boyfriend. When backed with the

28

strength of expert medical testimony, this defense is considerably more compelling than a simple denial of sexual abuse. Not only would it have rebutted the testimony of the People's medical expert, but it would have cast considerable doubt on all of the daughter's testimony. The failure of the trial court to consider the importance of this omitted expert testimony in denying petitioner's motion to vacate the judgment of conviction is an unreasonable application of the *Strickland* standard.

### b. Psychological

Petitioner claims that trial counsel was constitutionally deficient for neglecting to consult or call a psychological expert to rebut Dr. Lewittes' testimony. He argues that, had counsel conducted an adequate pre-trial investigation, he would have been able to present an expert witness to attack Dr. Lewittes' credibility as an expert.

Petitioner submits an affidavit from John Yuille, Ph.D., an expert in the field of child sexual abuse, in support of his habeas petition. Dr. Yuille's primary contention is that Child Sexual Abuse Accomodation Syndrome "is no longer regularly accepted in the child sexual abuse research community." Petitioner's Br., Exhibit B, ¶ 7. He also disputes Dr. Lewittes' opinion that the onset of adolescence can cause a child to disclose past incidents of sexual abuse, referring to it as a theory that has no recognized scientific validity. *Id.* ¶ 9. Finally, he opines that Dr. Lewittes' opinion that trauma blurs memory is "erroneous"; instead he suggests that "trauma has varying effects on memory, ranging from memory enhancement to diminishment." *Id.* ¶ 8 (emphasis omitted).

Trial counsel's failure to consult with or call an expert on Child Sexual Abuse Accomodation Syndrome is an independent and sufficient indication of deficiency. Together

29

with the failure to consult with a medical expert, it presents a serious case of ineffectiveness. The prosecution offered Dr. Lewittes' testimony to explain why the daughter did not accuse her father of sexual abuse until she was thirteen years old, eight years after it allegedly began. His testimony bolstered the daughter's credibility. Trial counsel's cross-examination was pallid, showing no grasp of the scientific predicates for the testimony. Moreover, in failing to call an expert to rebut Dr. Lewittes' testimony, trial counsel missed another critical opportunity to damage the daughter's credibility. There is no sound trial strategy that would justify this deficiency.

### 2. Failure to Request a *Frye* Hearing

Petitioner contends that his attorney was deficient for failing to request a *Frye* hearing with respect to the admissibility of Dr. Lewittes' testimony concerning Child Sexual Abuse Accomodation Syndrome. In his decision denying petitioner's motion to vacate the judgment of conviction, the trial judge found that Child Sexual Abuse Accomodation Syndrome was a "recognized diagnosis" and therefore petitioner would not have been entitled to such a hearing. *See* Respondent's Exhibits, Vol. II, Exhibit 11, at 4. In light of the well-established law in New York, the decision not to request a *Frye* hearing was a reasonable strategy that falls well within the realm of competent representation.

### 3. Failure to Object to Uncharged Crimes Evidence

Petitioner argues that trial counsel was ineffective for failing to object to prejudicial uncharged crimes and prior bad acts evidence on the basis that the probative value was outweighed by the potential for undue prejudice. In fact, trial counsel did object at the *Ventimiglia* hearing to the People's application to admit the uncharged crimes and succeeded in

30

preventing the admission of three of the bad acts. Tr. at 19-23, 25. Moreover, based upon the objections raised by trial counsel, the trial court only conditionally admitted three of the other bad acts. When the prosecutor failed to satisfy the conditions for admission, the court did not consider those acts in rendering its verdict. Tr. at 24, 289-90. Thus, ultimately six of the ten bad acts were excluded.

With respect to trial counsel's failure to object explicitly on the ground of undue prejudice, the trial court understood the correct evidentiary standard and appropriately applied that standard. The court cogently addressed the question of relevancy in its ruling. Tr. at 25. Counsel's performance was not rendered constitutionally infirm for failing to present a more thorough argument on an issue of law of which the court was already informed and subsequently applied in its rulings.

### 4. Remaining Claims

Petitioner's remaining claims of ineffective assistance of counsel are frivolous. They merit no further discussion.

### B. Admission of Uncharged Crimes Testimony

Petitioner's claim that he was deprived of due process of law by the trial court's evidentiary ruling admitting uncharged crimes evidence which consisted of other instances of sexual abuse and rape committed by petitioner against his daughter is procedurally defaulted. Petitioner raised the claim on direct appeal to the Appellate Division. The court held that the claim was "unpreserved for appellate review" and declined to consider it in the interest of justice. *People v. Gersten*, 719 N.Y.S.2d 900 (N.Y. App. Div. 2001). The claim was defaulted in state court pursuant to an independent and adequate state procedural rule for which petitioner cannot

31

demonstrate cause or actual prejudice. Thus, he is barred from asserting the claim in his habeas petition.

In any event, the claim lacks merit under any standard of review. Since this was a non-jury trial, there was no danger that admission of the uncharged crimes evidence would lead to a decision based on collateral matters or because of petitioner's past. Rather, during the *Ventimiglia* hearing, the court clearly stated the appropriate limited basis for admission of the evidence. The court should be assumed to have followed its own ruling.

C. Other Claims

No other issue open to consideration by this court has merit. *See Sumner v. Mata*, 449 U.S. 539, 548 (1981) ("a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit"). This opinion complies with *Miranda v. Bennett*, 322 F.3d. 171, 175–77 (2d Cir. 2003), and Rule 52 of the Federal Rules of Civil Procedure.

V. Conclusion

The petition for a writ of habeas corpus is granted on the ground of ineffective assistance of counsel. Petitioner is to be released unless state criminal proceedings are commenced against him within sixty days. This judgment is stayed until appeals are completed.

SO ORDERED.

Jack B. Weinstein
Senior District Judge

Dated:      January /6, 2004
            Brooklyn, NY

32